UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Hector L. Sanchez ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 16 CV 50309 |
| ) | Magistrate Judge Iain D. Johnston |
| Nancy A. Berryhill, Acting ) | |
| Commissioner of Social Security,[1] ) | |
| ) | |
| Defendant. ) | |

## **MEMORANDUM OPINION AND ORDER**

### INTRODUCTION

As this Court has noted previously, some Social Security applicants may not be sympathetic, likeable or even entirely credible. *Swagger v. Colvin*, No. 14 CV 50020, 2015 U.S. Dist. LEXIS 151502, *1 (N.D. Ill. Nov. 4, 2015). Sometimes, these applicants are less than pristine; they are people who possess very little, if any, work history, but who possess substantial criminal histories, drug abuse issues, and mental health concerns, which can all interrelate. *Booth v. Colvin*, No. 14 CV 50347, 2016 U.S. Dist. LEXIS 82754, *2 (N.D. Ill. June 27, 2016). The plaintiff in this case—Hector L. Sanchez—is one of those applicants.

By his own admission, plaintiff's problems began when he was ten years old and was arrested for starting a dumpster fire. In the subsequent years, he repeatedly got into fights, quit school, joined a gang, used and sold illegal drugs, committed numerous crimes (serving four prison sentences), and was arrested over fifty (50!) other times. He does not appear to have ever worked full-time for any significant period. Upon release from prison, he almost immediately began abusing drugs once again. Dkt. #9 at p. 5.

---

[1] Nancy A. Berryhill has been substituted for Carolyn W. Colvin. Fed. R. Civ. P. 25(d).

Administrative law judges likely see a parade of these types of applicants. *Koelling v. Colvin*, No. 14 CV 50018, 2015 U.S. Dist. LEXIS 140754, *1 (N.D. Ill. Oct. 6, 2015). And some may wonder why these applicants should receive taxpayer assistance. But that is a question beyond this Court's jurisdiction. The question before this Court is very limited: whether, after considering the relevant facts and law, there is substantial evidence to support the administrative decision as written. And in answering this question, the Court must follow controlling precedent. This Court is not free to disregard Seventh Circuit authority, including the Seventh Circuit's requirement that administrative law judges may not ignore entire lines of evidence and must build a logical bridge between the facts and the ultimate determination, a process that neither this Court or the government can do on appeal. *Swagger*, 2015 U.S. Dist. LEXIS 151502 at *2-3. This Court, like the administrative law judge, cannot deny benefits because an applicant is an unsavory character who engages in awful behavior. Instead, both must carefully review the facts and follow fundamental statutory, regulatory, and case-law requirements. *Koelling*, 2015 U.S. Dist. LEXIS 140754 at *2. In remanding this case, this Court makes no determination as to whether plaintiff is entitled to benefits. *Moore v. Colvin*, 743 F.3d 1118, 1124 (7th Cir. 2014).

FACTS

On April 30, 2014, plaintiff was released from the Lawrenceville Correctional Center after serving a seven-year sentence for his most recent crimes. A week later, he applied for supplemental security income. He was then 39 years old, and alleged that he had been disabled since 1994 based on mental impairments (the initial form listed psychosis, mood disorder, bipolar disorder, and depression). To support his claim, plaintiff submitted (among other things) his prison medical records allegedly showing mental problems including auditory hallucinations.

A couple of months after being released from prison, plaintiff was examined by a consultative examiner, psychologist John L. Peggau, who prepared a four-page report. Dr. Peggau diagnosed plaintiff with antisocial personality disorder. Because the Peggau report provides a good initial factual overview, and also because the administrative law judge relied on it in denying plaintiff's claim, the Court will set forth the entire "Summary and Conclusion" section contained at the end of the report. It states as follows:

**SUMMARY AND CONCLUSION:**

The claimant is a 39 1/2-year-old, left-handed, Hispanic male who will be 40 years old in a few days. A friend of his drove him to the evaluation session. His driver's license has been suspended for seven years following his fourth prison term for possession of a stolen vehicle and sales. Other prison sentences included possession/sales of cocaine and car theft. He was first arrested at 10 years of age for starting a dumpster on fire that spread to a building. He estimated having 29 juvenile detentions and 25 adult arrests including the four prison sentences. They included vandalism, auto theft, burglary, possession of a controlled substance cocaine, assault and battery of a police officer and battery. He was kicked out of school after eighth grade for constantly getting into fights and he never did get a GED.

The claimant said that he smokes less than one pack of cigarettes daily. He estimated not using cannabis in seven years and had also use[d] various forms of cocaine, acid and hallucinogenic mushrooms. He does drink three beers once per week, he estimated.

The claimant appeared muscular and physically fit. He had normal motor activity but said he was shot four times in the left leg in October 1997. He was not in any type of physical or emotional or traumatic distress. He has repeatedly performed acts that are grounds for arrest as indicated by nearly countless arrests, jail terms, juvenile detention and prison sentences. He has two children from a woman other than the woman he was married and divorced from. His 23-year-old son chooses to not have any contact with the claimant but the claimant has some contact with his 21-year-old daughter.

The claimant is not capable of managing finances, if awarded benefits. He is very irresponsible and has never worked more than three months, and that was only while in prison.

**The claimant's DMS-5 diagnosis is:**

    **301.7 Antisocial Personality-Severe**

> The above diagnosis only considers psychological, social and occupational functioning on a hypothetical continuum of mental health-illness. They do not consider impairment in functioning due to physical (environmental) limitations.
>
> The results of this evaluation are thought to be valid. I spent approximately 40 minutes with this claimant. Thank you for referring this claimant to me. Should you have any questions regarding this evaluation, please contact me.

R. 385-86 (emphasis supplied by Dr. Peggau).

In the year and a half after being released from prison, plaintiff periodically sought treatment at various clinics, but was not able to stay in treatment for a sustained period. He was evaluated by several doctors, and also went to the hospital multiple times complaining about suicidal thoughts. *See, e.g.,* R. 465 (9/23/14 hospitalization: "Patient admitted due to problems with suicidal thoughts and jumping in front of a bus in an attempt to hurt himself.").

An administrative hearing was held on January 6, 2016. Plaintiff and a vocational expert were the only two witnesses. No medical expert testified. On February 12, 2016, the administrative law judge ("ALJ") issued his decision. The ALJ agreed that plaintiff suffered from an affective disorder and a personality disorder of some sort, but concluded that plaintiff could still do the full range of work subject to certain limitations. The ALJ's main rationale was that plaintiff was not credible because he did not consistently pursue treatment and because he made a series of untrue or questionable statements about miscellaneous matters. The following passage at the end of the decision contains the most detailed discussion of the ALJ's reasoning:

> [A]fter considering the factors in SSR 96-7p, I find that the claimant is not fully credible. The alleged severity of his symptoms is not supported by the medical evidence of record. [Claimant] gave contradictory testimony regarding drug and alcohol use. His testimony regarding auditory voices was generally not credible as he stated that he is not sure if the voice is always the same and that he is unable to identify the voice. The record shows inconsistent treatment throughout the period at issue despite a long history of mental illness. The claimant's lack of compliance with intensive outpatient treatment in May 2015 does not provide strong support for his allegations. Moreover, the record does not contain any opinions from

treating or examining sources indicating that the claimant's residual functional capacity was more limited for the entire period at issue.

R. 22.

ANALYSIS

In this appeal, plaintiff criticizes the ALJ's decision in specific ways, but the overarching theme is that the ALJ provided "little factual analysis in a case involving significant mental health complaints." Dkt. # 9 at 8. The Court agrees. The decision fails to address all of the relevant lines of evidence, contains several gaps where the ALJ's reasoning is unclear, and in other places, provides only a cursory factual summary, leaving this Court uncertain about how the ALJ reached certain of his conclusions.[2] Additionally, the ALJ's analysis also rests on a layperson analysis of complex psychiatric conditions.

Plaintiff's primary argument is that the ALJ ignored all of his prison medical records. These records (89 pages) are contained in Exhibit 1F. Plaintiff calls these records a "rich source" of information because they show his condition while "in a controlled, drug free environment." *Id.* Plaintiff's opening brief contains a lengthy bullet-list summary of approximately 47 entries from these records, covering a span from December 2007 to March 2014. These entries include complaints plaintiff made (*e.g.* "Patient indicated that he has seen 'spiders' and 'shadow people'" and that he has heard "mumbled voices" that call his name. (R. 236)), diagnoses made by doctors (*e.g.* bipolar disorder, depression, anxiety), and medications plaintiff had taken (*e.g.* Celexa, Zoloft, Paxil, Prozac, Trazodone, Depakote, Haldol, Risperdal (*id.*)).[3]

---

[2] At nine pages, the decision is shorter than the typical ALJ decision seen by this Court. But at the same time, the administrative record, at 490 pages, is also shorter.

[3] At the same time, these records indicate periods where plaintiff's symptoms improved. *See, e.g.* R. 268 (doing well and benefiting from treatment). Likewise, these records indicate that plaintiff refused treatment and medication. Dkt. #9 at 2.

5

Did the ALJ fail to address this line of evidence? Unfortunately, the short answer is yes. One simple litmus test is to look at the decision and see whether the ALJ ever cited to Exhibit 1F. Aside from a one generic reference to a group of exhibits, one of which was Exhibit 1F, the decision never refers to, or discusses, this exhibit. The Court likewise cannot find any general discussion of plaintiff's medical history while in prison. The only concrete reference to this period was that plaintiff had a job in prison, for three months, sweeping floors. The ALJ cited to this fact (although leaving out the part about it only lasting three months) to bolster the ALJ's conclusion that plaintiff only had mild limitations in daily activities. The ALJ thus was aware of, and willing to rely on, some evidence from this plaintiff's general time in prison. *See Scrogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014) (an ALJ may not use a "sound-bite" approach in which favorable evidence is cited but unfavorable "related evidence" is ignored). In its response brief, the Government has not disputed that the ALJ ignored this entire line of evidence, nor has the Government offered a theory to explain why the ALJ could have reasonably chosen to ignore this evidence. Moreover, the government does not argue that this failure was merely harmless error.

At this point, the Court need not analyze how persuasive this evidence might be to the larger questions in this case. It is enough to find that plaintiff has raised colorable arguments that some of this evidence supports his case in various ways and potentially undermines the ALJ's rationales. First, one of plaintiff's complaints is that the ALJ erred in finding that plaintiff's allegation about hearing voices was not credible. Although the ALJ offered one rationale for discounting these allegations—a rationale that itself is shaky as discussed below—the ALJ never acknowledged the evidence from these prison records showing that plaintiff sometimes complained about, and was occasionally treated for, this problem. Plaintiff believes that the

prison records provide longitudinal credibility. Second, plaintiff argues that the ALJ wrongly found that he failed to consistently seek treatment for his mental health problems. Plaintiff argues that the prison records undermine this general rationale by showing that he sought treatment on a fairly regular basis for almost seven years while in prison. In sum, the Court finds that plaintiff has shown both that the ALJ ignored these records and that they may have been probative on several relevant issues. This is a reason to remand the case. *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012) (ALJs cannot ignore whole lines of evidence).

But there are several other grounds that reinforce this conclusion. One larger concern is that the ALJ's decision seems to rest largely on the ALJ's layperson intuitions. *See Lewis v. Colvin*, No. 14 CV 50195, 2016 U.S. Dist. LEXIS 115969, *11 n. 3 (N.D. Ill. Aug. 30, 2016) (courts, counsel, and ALJs must resist the temptation to play doctor). As noted earlier, the ALJ did not call a medical expert at the administrative hearing. It is true that the ALJ claimed to have relied (with one exception) on Dr. Peggau's report, as well as on the reports of two State agency physicians. *See* Exs. 1A, 3A. But these reports are vague and fail to grapple with the key issues. It is also not clear that these reports supported the ALJ's specific rationales.

The Peggau report was cited often in the decision (six separate times by this Court's count), but the ALJ primarily used it as a source for factual statements about plaintiff. The report contains little formal analysis of plaintiff's psychiatric conditions. It sets forth a long summary of plaintiff's life story, as told by plaintiff; then includes a short discussion of tests about plaintiff's mathematical abilities and his proverb-interpretation abilities; and concludes with the diagnosis of severe antisocial personality disorder, as defined by the DSM-5. But there is no discussion as to *how* Dr. Peggau reached the latter conclusion. There are no mid-level findings bridging the miscellaneous biographical facts (*e.g.* that plaintiff was arrested 54 times) to the bottom-line

7

diagnosis. Dr. Peggau did not explain, for example, why he chose the particular diagnosis of antisocial personality disorder, as opposed to bipolar disorder or schizophrenia, which were diagnoses made by other doctors at various points.[4] In general, it is unclear how serious Dr. Peggau believed plaintiff's condition was, whether he believed plaintiff was lying or malingering or exaggerating in any way (54 arrests are a lot), or whether he believed that plaintiff could work full-time given his diagnosis and its attendant limitations. Moreover, the few analytical statements that are contained in the report arguably support plaintiff's case. One was the diagnosis itself, and specifically the doctor's conclusion that the antisocial personality disorder was severe. The word "severe" seems to support plaintiff's case, at least in a loose way.[5] However, in the decision, the ALJ omitted this word. The other analytical comment is the statement that plaintiff would not be able to manage his finances if awarded disability benefits because he was "very irresponsible." The ALJ at least did not ignore this statement, rejecting it on the ground that it was "somewhat vague." This may be a reasonable judgment, as this Court likewise cannot tell what the doctor meant by this brief phrase. (Did it reflect a reasoned medical analysis or was it more of a layperson moral judgment?). But this same criticism could be used to reject the entire report. The upshot is that the Peggau report, though not contradicting the ALJ's conclusions, does not provide much support for it either. The report ambiguously glides across the surface of the core issues in this case.

As for the State agency opinions, they are no more informative. They are mostly derivative of the Peggau report; these doctors never examined plaintiff; and their reports contain

---

[4] For example, in August 2014, plaintiff sought treatment at Rosecrance and was diagnosed with bipolar disorder, most recent episode mixed, severe with psychotic features, and also with antisocial personality disorder. R. 418. In September 2014, plaintiff was seen in the emergency department at Swedish American Hospital, complaining of feeling suicidal and depressed, and was diagnosed with schizoaffective disorder, bipolar disorder, and polysubstance abuse. R. 465.
[5] The Court understands that Dr. Peggau used the term "severe" as it is used in common parlance, not as it is used in Social Security regulation jargon, where "severe" means less than the ordinary understanding of that term.

8

no analysis that is connected to the ALJ's rationales. The ALJ did not discuss the specific details of these reports and only stated that they were being given "significant weight" because these doctors were supposedly "highly qualified" in evaluating mental health claims and because their findings were allegedly "consistent with the record as a whole." R. 22. But no facts were given to substantiate either rationale.

Further evidence that the ALJ did not seriously rely on these expert reports is the following analysis the ALJ gave for doubting plaintiff's claim of auditory hallucinations:

> [Plaintiff's] testimony regarding auditory voices was generally not credible as he stated that he is not sure if the voice is always the same and that he is unable to identify the voice.

R. 22. Insofar as this Court can tell, having scoured the record, neither Dr. Peggau nor the State agency physicians rendered any opinion relying on this type of analysis. This point aside, the ALJ's analysis rests on several unexplained assumptions about the nature of auditory hallucinations. Presumably—and the Court is not entirely sure because of the brief explanation—the ALJ believed that a person who hears voices will always hear the same voice and also will be able to "identify" that particular voice. Whatever the ALJ meant by these implied requirements, the larger point remains that there is no evidence that the ALJ's analysis was medically grounded. Plaintiff maintains that his hallucinations are an important part of his case, and the Court finds that the ALJ's analysis is completely unsupported by any medical evidence in the record.

Another area not fully developed is plaintiff's drug and alcohol use. The ALJ mentioned it several times in the decision, and also downgraded plaintiff's credibility because he

supposedly gave inconsistent testimony about his drug use.[6] This raises a concern that the ALJ was influenced by this behavior. Yet, at the same time, the ALJ never conducted a materiality analysis. *See* 42 U.S.C. § 423(d)(2)(C) (a claimant cannot be found disabled "if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled"). The Government argues that the ALJ did not need to conduct a materiality analysis because the ALJ concluded that plaintiff was not disabled even though he was abusing alcohol and drugs. But the problem with this argument is that the ALJ in several instances seemed to be engaging in a de facto materiality analysis. In discounting a low GAF score plaintiff had on one occasion, the ALJ stated the following: "I also note that recent drug use may have affected the claimant's GAF score upon hospital admission in September 2014[.]." (An opinion again not based on any medical evidence in the record.) R. 19. In another instance, the ALJ noted that plaintiff had been hospitalized in November 2015 and January 2016 "due to reported overdoses," giving the impression that the drug use rendered this evidence less probative. R. 21.

The above discussion leads to a third area of concern, which is whether the ALJ failed to appreciate the ways that plaintiff's mental impairments may have complicated the credibility analysis. To return to the drug abuse issue, the Seventh Circuit has noted that a claimant's mental illnesses may be the cause of drug and alcohol abuse rather than the other way round. *See Kangail v. Barnhart*, 454 F.3d 627, 629 (7th Cir. 2006) ("bipolar disorder can precipitate substance abuse, for example as a means by which the sufferer tries to alleviate her

---

[6] As for the specific finding by the ALJ that plaintiff "gave contradictory testimony regarding drug and alcohol use" (R. 22), the record is not clear about exactly how plaintiff supposedly lied. The factual predicate is not fully explained by the ALJ. This is another instance where the decision leaves out critical details.

10

symptoms").[7] Similarly, the Seventh Circuit has noted that a claimant's mental illness "may prevent the sufferer from taking her prescribed medicines or otherwise submitting to treatment." *Id.* at 630. Here, the ALJ faulted plaintiff for not diligently pursuing treatment, but never considered this explanation. A final related consideration is that one feature of antisocial personality disorder is "[d]eceitfulness, as indicated by repeated lying, use of aliases, or conning others for personal profit or pleasure." DSM-5, 301.7 (the section quoted by Dr. Peggau). This fact creates a potentially tricky catch-22 situation when assessing credibility. This is another reason why the ALJ should call an expert witness on remand.

The above issues are the major concerns, but the Court will briefly comment on a few more additional discrete issues that largely echo the ones covered above.

First, the ALJ seemed to fault plaintiff for applying for disability benefits the week after he left prison. Specifically, in the first paragraph immediately following the umbrella paragraph announcing that plaintiff's statements were "not entirely credible," the ALJ stated the following: "[T]he claimant was released from prison on April 30, 2014[.] He filed an application for disability about a week later, on May 6, 2014." R. 21. But it is not obvious why plaintiff's credibility should be discounted because he applied for benefits so soon after leaving prison—if in fact that is what the ALJ was suggesting. It is plaintiff's theory that he has been disabled since 1994. Moreover, the ALJ left out a mitigating fact. Plaintiff testified at the hearing that he started the application process *before* leaving prison and did so with the help of a mental health counselor there. R. 38. This suggests that someone encouraged him to apply for benefits immediately.

---

[7] This Court has previously questioned the broad statements in *Kangail*. *See Lewis v. Colvin*, No. 14 CV 50195, 2016 U.S. Dist. LEXIS 115969, *11 n. 3 (N.D. Ill. Aug. 30, 2016).

11

Second, the ALJ repeatedly dismissed plaintiff's post-prison hospitalizations by labelling them as "brief" stays. But the supporting factual details are not supplied. Specifically, the Court cannot tell precisely how long these stays were and, therefore, what the ALJ meant by calling them "brief"—does this mean only a few hours, a few days, or something else? These facts may be important in assessing the weight the ALJ gave to these multiple hospitalizations. Plaintiff's general complaint is that the ALJ glossed over evidence favorable to him by briefly mentioning the piece of evidence, but then giving it no real attention. This is one such example.

Third, plaintiff complains that the ALJ gave too much weight to his ability to do basic household chores. The ALJ noted that plaintiff typically wakes up "at about 4:30 a.m., brushes his teeth, has a cigarette, and then makes everyone breakfast when they wake up" and that he "does the dishes, cooks, showers every day or every other day, and enjoys watching movies." R. 19. Plaintiff accuses the ALJ of "grasping for straws" in relying on plaintiff's ability to cook an egg in the microwave and smoke a cigarette before breakfast. The Court agrees that, standing alone, these anodyne activities are clearly insufficient to show that plaintiff could work full-time. But in fairness to the ALJ, these statements were merely included in the specific portion of the decision evaluating plaintiff's ability to do activities of daily living.

In conclusion, the Court finds that this case requires further analysis. On remand, the ALJ must call a medical expert or otherwise develop the record to address these questions. HALLEX I-2-5-34A.1. The Court recognizes that the plaintiff's troubled, crime-filled life does not make him a sympathetic disability claimant. And it may be that, after further analysis with the aid of an expert witness, the ALJ is justified in denying him benefits. But before any such judgment is rendered, plaintiff deserves the opportunity to have his arguments fully and fairly considered and then adequately explained in a written decision.

For all the above reasons, plaintiff's motion for summary judgment is granted, the government's motion is denied, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

Date:  December 19, 2017                              By:  _____
                                                                              Iain D. Johnston
                                                                              United States Magistrate Judge